**SECOND DIVISION**
**MILLER, P. J.,**
**ANDREWS, J., and SENIOR APPELLATE JUDGE BEASLEY**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**May 3, 2018**

# In the Court of Appeals of Georgia

A18A0480. ALLEN v. THE STATE.

MILLER, Presiding Judge.

A jury convicted Laverne Lee Allen[1] of incest, rape, child molestation, and aggravated child molestation, stemming from his sexual abuse of two of his children. Allen now appeals from the trial court's denial of his motion for new trial, challenging his convictions on grounds of (1) insufficient evidence; (2) ineffective assistance of counsel; (3) admission of impermissible character evidence; (4) prejudicial admonishments from the courtroom deputy; and (5) the improper limitation of examination of a witness.

---

[1] Although appellant's name is spelled "Lavern" in his appellate brief, we observe that it is spelled "Laverne" in the indictment and sentencing sheet.

We conclude that the evidence was sufficient to support the jury's verdict; trial counsel's performance was reasonable; the trial court committed no error in its admission of testimony; the courtroom deputy's instructions to Allen did not result in prejudice; and any error on the part of the trial court in limiting the witness examination was harmless. Therefore, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the record shows that Allen and Rayciayah Lindsey are the parents of four children, including a daughter, T.A., and a son, L.A. When T.A. was around five or six years old, Allen bit her vagina over her clothing, and she reported this to her maternal aunt. The aunt relayed this to Rayciayah, who demanded that Allen leave the home. Allen moved away from the home for a while, but later returned.

Then, when T.A. was eight years old, Allen began placing his hands under her clothing and touching her buttocks and vagina. From that time, until T.A. was fifteen years old, Allen had vaginal and anal intercourse with T.A. "so many times that [she] lost count. T.A. did not want Allen to have sex with her, and the acts hurt each time, but because she was scared of Allen, she "took [her] clothes off" "on [her] own"

---

[2]*Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

when Allen wanted to have intercourse with her. Allen threatened T.A. that if she told anyone about what was occurring, he would hurt her, L.A., and Rayciayah.

On one occasion, when the son, L.A., was six years old, he entered his parents' bedroom and saw T.A. lying on her back, with Allen positioned between her legs, with his underwear around his knees. L.A. observed Allen go "up and down" on T.A. T.A. was screaming for Allen to get off of her, and when L.A. attempted to tell Allen to do so, Allen told L.A. to leave the room and later cautioned him that if he told anyone about what he had seen, he would hurt him. T.A. recounted that Allen also hit L.A. after this incident.

Starting from when L.A. was nine years old, and continuing until he was eleven, Allen had anal sex with him nine times. During the acts, L.A. told Allen to "stop," but Allen refused, sometimes pushing L.A.'s head into a pillow when he yelled. L.A. made no outcry to his mother because Allen warned him that if he told anyone, he would hurt L.A. or "put [him] in the ground . . . six feet under the ground." L.A. believed that Allen would act on these threats because he had previously seen Allen with a gun. When L.A. later began living with his maternal aunt, he told her about the abuse.

3

Between 2012 and 2013, while Allen was not living in the family home, Rayciayah began asking T.A. whether anyone had been touching her. After initially denying that she had been having sex, T.A. implicated her male cousin, rather than Allen, in an attempt to protect Allen. T.A. later admitted that Allen had been having sex with her. The following year, when Allen returned to the home, T.A. told him that a "white man" had sexual contact with her, referring to her friend's father. Allen called the police, and in T.A.'s statement to the officer, given while in Allen's presence, she maintained that a "white man" had sexually assaulted her. Hours later, police returned to the home after they received another call, and T.A. told the officer that her earlier account was untrue, that Allen had been raping her, and that she could not guess the number of times it had occurred. Allen later instructed L.A. to tell T.A. to retract this latter statement to the police.

A Clayton County grand jury indicted Allen on 18 charges, specifically, six counts of child molestation (OCGA § 16-6-4 (a)), five counts of incest (OCGA § 16-6-22 (a)),[3] three counts of aggravated child molestation (OCGA § 16-6-4 (c)), two counts of rape (OCGA § 16-6-1 (a)), and one count of influencing a witness (OCGA

---

[3] One of the incest charges was dismissed after the trial court sustained Allen's demurrer as to that count.

§ 16-10-93 (b) (1)). Allen's first trial resulted in a mistrial after defense counsel and the prosecutor learned that T.A. received a medical examination after she made the allegations, the results of which had not been in the State's case file. Allen was re-tried the following year and was convicted of the influencing-a-witness count.[4] The jury was hung on the remaining counts of the indictment, and the trial court declared a mistrial as to those counts.

In 2016, when Allen was tried a third time, the jury convicted him on the remaining counts of the indictment, and he received a sentence of life imprisonment. Allen moved for a new trial, and, after a hearing, the trial court denied the motion. This appeal followed.

1. Allen contends that there was insufficient evidence to support the jury's verdict, given that T.A. implicated different persons as her abuser, and because the State presented no DNA evidence. This argument is meritless.

"When reviewing a defendant's challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence." (Citations omitted.) *Lancaster v. State*, 291 Ga. App. 347, 348 (662 SE2d 181) (2008). "We do not . . .

---

[4] Allen was sentenced to ten years imprisonment on this charge.

5

re-weigh testimony, determine witness credibility, or address assertions of conflicting evidence; our role is to determine whether the evidence presented is sufficient for a rational trier of fact to find guilt beyond a reasonable doubt." (Citation omitted.) *Hall v. State*, 294 Ga. App. 274, 275 (668 SE2d 880) (2008).

The victims testified to the incidents as explicated above, and, even in the absence of DNA evidence, this testimony was sufficient for the jury to convict Allen beyond a reasonable doubt of every charge in the indictment.[5] *Tinson v. State*, 337 Ga. App. 83, 85-86 (1) (785 SE2d 914) (2016) (corroboration of a sexual crime victim's testimony is not required); *Mangham v. State*, 291 Ga. App. 696, 697 (662 SE2d 789) (2008) (testimony sufficient to support guilty verdict on aggravated child molestation although uncorroborated by medical evidence).

---

[5] See OCGA § 16-6-4 (a) (defining child molestation as "any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person"); OCGA § 16-6-4 (c) (aggravated child molestation requires "an offense of child molestation which act physically injures the child or involves an act of sodomy"); *Mangham*, supra, 291 Ga. App. at 696 (testimony that molestation was painful was sufficient to prove physical injury element); OCGA § 16-6-1 (a) (rape requires "carnal knowledge of (1) [a] female forcibly and against her will; or (2) [a] female who is less than ten years of age"); OCGA § 16-6-22 (a) (1) (defining incest as "sexual intercourse or sodomy . . . with a person whom [the defendant] knows he . . . is related to either by blood or by marriage as . . . [f]ather and child or stepchild).

Further, the jury viewed the forensic interviews of the victims, in which they both indicated that Allen had committed the acts. T.A. testified that she did not implicate her father at first because she was "covering up" for him and was scared of him. L.A. also explained that his father had threatened to hurt or kill him if he made any outcry. The forensic interviewer, who was accepted without objection as an expert in forensic interviewing and child advocacy, testified that she had concluded that neither victim had been coached, and that threats like those Allen made to the victims commonly lead to a delay in disclosure of abuse.

"In any event, it is the jury's role to resolve conflicts in the evidence and determine the credibility of witnesses, and the presence of such conflicts does not render the evidence insufficient." (Citation and footnote omitted.) *Malone v. State*, 277 Ga. App. 694, 696 (1) (627 SE2d 378) (2006); *Crane v. State*, 291 Ga. App. 414, 415-416 (662 SE2d 225) (2008) (evidence sufficient although victim initially offered conflicting accounts regarding whether appellant molested her). Here, it is clear that the jury resolved any conflicts in the evidence adversely to Allen, and we will not disturb the jury's findings in this regard. Accordingly, the evidence authorized the jury to find Allen guilty of the offenses for which he was convicted.

2. As his second enumeration of error, Allen contends that reversal is warranted because the verdicts were against the weight of the evidence and contrary to the principles of justice and equity. Allen raised this issue before the trial court at the hearing on the motion for new trial, but the trial court declined to exercise its discretion to overturn the jury's verdict. We find no error.

> Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to . . . the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial—commonly known as the "general grounds"—require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'"

(Citation omitted.) *Allen v. State*, 296 Ga. 738, 741 (2) (770 SE2d 625) (2015).

> However,

> [w]hether to grant a new trial based on OCGA § 5-5-21, i.e., that the verdict is strongly against the evidence, is one that is solely in the discretion of the trial court, and the appellate courts do not have the same discretion to order new trials. Thus, even when an appellant asks this Court to review a trial court's refusal to grant a new trial on the general grounds, this Court must review the case under the standard set forth in *Jackson v. Virginia*, [supra], that is, if the evidence viewed in

8

the light most favorable to the prosecution, supports the verdict or verdicts.

(Citations omitted.) Id. Therefore, in light of our sufficiency analysis in Division 1, this enumeration also provides no basis for reversal. Id. at 742 (2).

3. In two enumerations of error, Allen claims that he received ineffective assistance of counsel. We disagree.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. [See] *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LEd2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.

(Citations and punctuation omitted.) *Bridges v. State*, 286 Ga. 535, 537 (1) (690 SE2d 136) (2010). With this standard in mind, we examine Allen's two arguments.

(a) First, Allen contends that trial counsel rendered ineffective assistance because the clinical psychologist whom he used to offer expert testimony, Dr. Farrar, had been disciplined by his professional governing authority. Allen fails to show that counsel's performance was deficient, and thus, the trial court properly denied Allen's motion for a new trial on these grounds.

As an initial matter, "[d]ecisions as to which witnesses to call are matters of trial strategy and tactics that usually do not constitute ineffective assistance of counsel." (Citation omitted.) *Lord v. State*, 259 Ga. App. 449, 451 (2) (577 SE2d 103) (2003). And, counsel's "strategic decisions made after thorough investigation are virtually unchallengeable. They provide no grounds for reversal unless such tactical decisions are so patently unreasonable that no competent attorney would have chosen them." (Citation and footnote omitted.) *Pippins v. State*, 263 Ga. App. 453, 458 (4) (a) (588 SE2d 278) (2003).

It is exceedingly clear from the record that counsel did not retain Dr. Farrar for want of a thorough investigation. At the hearing on the motion for new trial, counsel testified that Dr. Farrar had provided him with a report detailing problems he

10

perceived existed with the forensic interviews and he called Dr. Farrar to testify regarding proper interviewing techniques with child sexual abuse victims. Counsel explained, "like everybody, he had some weaknesses and he had some strengths." Counsel testified that he knew that Dr. Farrar had received an ethical sanction, and he also testified to the requisites Dr. Farrar satisfied for the reinstatement of his professional license. Indeed, according to counsel, he anticipated that the State would cross-examine Dr. Farrar on this issue in Allen's case.

Although counsel identified another psychologist whom he may have considered, he testified that he ultimately chose Dr. Farrar because he was a good witness, he had previously used him as an expert, Dr. Farrar had significant experience testifying in court, and he did not wither under cross-examination. Counsel added, Dr. Farrar "holds his ground. He's intelligent and he's pretty quick on his feet."

Defense counsel's strategy, therefore, was to minimize the disciplinary issue. During direct examination, counsel preemptively questioned Dr. Farrar on the circumstances leading to the license suspension. Dr. Farrar testified that in his 32-year career, he had been qualified as an expert more than 600 times, and that although he ultimately lost his appeal of the licensing board's disciplinary decision against him,

11

he was once again in good standing with the board. Dr. Farrar then opined at length as to various ways in which he believed the victim interviews had been conducted improperly, including his findings of interviewer bias. "Under these circumstances, the trial court was authorized to conclude that calling the psychologist as a defense witness fell within the broad spectrum of reasonable trial strategy and that no deficient performance was shown." *Adem v. State*, 300 Ga. App. 708, 714 (3) (686 SE2d 339) (2009).

(b) Next, Allen argues that his trial counsel was ineffective in failing to file a plea in bar based on double jeopardy, after Allen's first trial ended in a mistrial due to the State's failure to provide Allen with the report from T.A.'s physical examination. We disagree.

> [P]rosecutorial misconduct will support a plea in bar based on double jeopardy only if the prosecutor intended to subvert the defendant's double jeopardy rights by aborting the trial and securing an opportunity to retry the case. In the context of a granted motion for mistrial, this means the prosecutor intended to goad or provoke the defendant into moving for a mistrial.

(Citations omitted.) *State v. D'Auria*, 229 Ga. App. 34, 35 (492 SE2d 918) (1997).

12

During Allen's first trial, the detective investigating the case testified that she had not scheduled any medical examinations on the victims. But after being confronted with a transcript reflecting her testimony from the preliminary hearing, she confirmed that an examination on T.A. had been scheduled. During a recess, the prosecutor contacted the sexual assault center and discovered that an examination on T.A. had in fact been completed. He provided defense counsel with a copy of the corresponding report, explaining to the trial court that the State's file had not shown that any examination had been conducted, and he had no knowledge to that effect either. Allen moved for a mistrial, and the trial court granted the request, although the trial court found no misconduct on the part of the State.

It does not appear that Allen is arguing that the prosecuting attorney had an improper intent; rather, Allen claims that the *detective* had a pattern of misbehavior, which must be "imputed to the State as knowledge" because it would be against the principles of due process if the prosecutor were allowed to disclaim responsibility.

First, the Supreme Court of Georgia rejected an analogous imputation argument in *State v. Traylor*, 281 Ga. 730, 732-733 (642 SE2d 700) (2007). In *Traylor*, the Supreme Court held that "[f]or double jeopardy to apply, it is not sufficient that an intent to instigate a mistrial was possessed only by an agent of the State whose scope

13

of employment and authority differs from the prosecutor." Id. at 733. Because the detective was not "the person in control of the prosecution," id., her intent regarding the medical examination is of no consequence. Further, even assuming that the detective's conduct could be imputed to the prosecutor in this case, the record does not evince that she intended to goad Allen into moving for a mistrial, and Allen identifies no indicia of such an intent. At the hearing on the motion for new trial, trial counsel testified that he had examined the possibility of filing a plea in bar but did not have any evidence that the prosecutor had engaged in misconduct and thus did not believe the motion would have been meritorious.

Given the evidence here, there is no basis to impute the detective's supposed misconduct to the prosecutor. Therefore, a plea in bar would not have been successful in this case, and trial counsel's failure to pursue it does not constitute ineffective assistance of counsel. *Gordon v. State*, 252 Ga. App. 133, 135 (1) (555 SE2d 793) (2001).

4. Next, Allen claims that the trial court erred by allowing the State to pursue cross-examination that elicited impermissible character evidence. We find no error.

Evidence is relevant if it has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less

14

probable than it would be without the evidence." (Emphases supplied.) OCGA § 24-4-401. "Whether to admit evidence is a matter resting in the trial court's sound discretion, and evidence that is relevant and material to an issue in the case is not rendered inadmissible because it incidentally places the defendant's character in issue." (Citation and footnote omitted.) *Hernandez v. State*, 304 Ga. App. 435, 437 (3) (696 SE2d 155) (2010).

During a pre-trial conference, the trial court ruled that if the State intended to introduce evidence regarding Allen's prior violent acts in the home, it would rule on admissibility if and when the issue was raised during trial. When Allen called Rayciayah to testify in his defense, the prosecutor asked her whether Allen had ever been violent in the home, drawing an immediate objection from defense counsel. During the bench conference that followed, the State argued that it was eliciting such testimony because of Allen's threats to the victims, and to the extent that the violence occurred while the victims were living at home, the testimony was probative of whether the victims were intimidated by Allen and, resultantly, "went along with" the sexual abuse and delayed in disclosing it.

The trial court deemed the evidence probative of Allen's ability to execute the threats to which the victims had testified, but then limited the State's questioning to

15

"violent acts towards the children or [Rayciayah] that took place in the presence of the children or in the home while the children were there." When Rayciayah subsequently testified that Allen had not been violent in the home after the victims were born, she was impeached with evidence of Allen's conviction for aggravated assault, involving an incident in which Allen had pointed a gun at her.

First, we note that Allen was charged with two counts of rape against T.A. Force, as a constituent element of rape,[6] "may be inferred by evidence of intimidation arising from the familial relationship, and may be proved by direct or circumstantial evidence. Lack of resistance, induced by fear, is not legally cognizable consent." (Citations, punctuation, and footnotes omitted.) *Williams v. State*, 284 Ga. App. 255, 256-257 (1) (a) (b) (643 SE2d 749) (2007); *Pollard v. State*, 260 Ga. App. 540, 542-543 (3) (580 SE2d 337) (2003) (intimidation can establish force and therefore threat that victim would never see her family again if she disclosed abuse was sufficient to establish force). In light of T.A.'s testimony, evidence of Allen's violent behavior in the home after she was born tended to make it more probable that she submitted to intercourse with Allen because she was intimidated by him.

---

[6] OCGA § 16-6-1 (a).

16

Further, "Georgia's appellate courts have consistently held that evidence of a defendant's history of violence toward a victim, a victim's family, or even a witness, is admissible to explain a delay by the victim, her family, or another witness in reporting a crime." *Brown v. State*, 324 Ga. App. 718, 724 (3) (751 SE2d 517) (2013).

Here, Rayciayah testified that although she had repeatedly asked T.A. whether she had had sex with anyone, T.A. indicated that she had not. However, T.A. previously testified that the reason for these negative responses to her mother was that she was scared of Allen. She also insisted that she never physically fought off Allen during the assaults because of his threats to her, L.A., and Rayciayah; that she had seen Allen hit Rayciayah and throw things at her; that she had seen Allen whip L.A. when L.A. walked in on Allen having sex with T.A.; and that she had seen Allen with a gun in the home. Likewise, L.A. testified that he believed Allen would act on his threats towards him because he knew Allen had a gun.

As other states have recognized, "when the victim of an alleged sexual offense did not make a prompt complaint but instead disclosed the alleged incident only some time later, evidence of the fact[s] and circumstances surrounding the delayed complaint also may be relevant to the jury's evaluation of the likelihood that the

17

offense did or did not occur." *People v. Brown*, 883 P2d 949, 958 (IV) (Cal. 1994). Thus,

> [a]dmission of evidence of the circumstances surrounding a delayed [sexual assault] complaint, including those that might shed light upon the reason for the delay, will reduce the risk that the jury, perhaps influenced by outmoded myths regarding the "usual" or "natural" response of victims of sexual offenses, will arrive at an erroneous conclusion with regard to whether the offense occurred.

Id.

We conclude that on the facts present here, the State's questioning was also probative of whether Allen's behavior created a threatening atmosphere in the home, and would have therefore tended to explain the victims' reluctance to disclose the abuse. See *United States v. Powers*, 59 F3d 1460, 1464 (II) (A) (4th Cir. 1995) (testimony of victim, as well as victim's mother and brother, regarding defendant's violence in the home, provided "a cogent explanation for [the victim's] failure to report the sexual abuse for almost eighteen months" and made "it more probable that [the victim] failed to report the sexual abuse . . . because of her fear of retribution"); *Commonwealth v. Dillon*, 925 A2d 131, 139 (Pa. 2007) (defendant's aggravated assault conviction, stemming from incident wherein defendant broke victim's leg,

18

tended to show reasons for victim's delay in reporting defendant's sexual assaults and explained events surrounding the assaults and the prosecution so that the case presented to the jury did not appear in a vacuum).

For these reasons, we reject Allen's contention that his conduct would not have been relevant or probative. And, "[i]n light of the strong preference for admission of relevant evidence under OCGA § 24-4-401," *Anderson v. State*, 337 Ga. App. 739, 743 (1) (788 SE2d 831) (2016), the trial court also committed no error in determining that the prejudicial value of the evidence did not substantially outweigh its probative value. Accordingly, Allen is not entitled to relief on these grounds.

5. Next, Allen claims that the trial court wrongfully permitted the sheriff's deputy to repeatedly admonish him to stop crying during trial because these admonishments impeded the presumption of innocence to which he was entitled. This contention is unpersuasive.

> It is well established that the accused, while in the presence of the jury, should be free of indicia of guilt such as wearing shackles or prison garb, or being surrounded by uniformed security personnel, or anything else that might infringe upon the presumption that he is innocent. However, there is no question that every court has the power to preserve and enforce order in its immediate presence, and as near thereto as is

19

necessary to prevent interruption, disturbance, or hindrance to its proceedings.

(Citations, footnotes, and punctuation omitted.) *Daniels v. State*, 310 Ga. App. 541, 545 (2) (713 SE2d 689) (2011). "To demonstrate error, the defendant must show that the security measure utilized was so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial." (Citation and punctuation omitted.) *Brashier v. State*, 299 Ga. App. 107, 108 (1) (681 SE2d 750) (2009).

The record does not reflect that the deputy ever admonished Allen to stop crying. Rather, the testimony elicited from witnesses from both the State and the defense was that Allen sometimes faced the jurors and the prosecutor's table, and the deputy instructed Allen to face forward instead. The deputy explained that this security measure was for the safety of everyone in the courtroom, particularly given past incidents of defendants leaving their seats and attacking persons in the courtroom. The deputy further testified that because defendants are not restrained, having them face forward allows a deputy more response time in the event of an incident. This security measure is not at all comparable to the shackling Allen alludes to in his appellate brief, and Allen fails to demonstrate that the deputy's instruction

was so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial.

Moreover, it is undisputed that this issue was not raised during the trial, either by defense counsel or his colleague who testified to having observed the admonishments. Indeed, at the hearing on the motion for new trial, the trial court stated that this issue was not brought to the court's attention, and the court did not notice the deputy admonishing Allen. Allen's trial counsel recalled the deputy approaching Allen, but had no independent memory of the deputy doing anything in the jury's presence that would have prejudiced Allen. Thus, we find no error on the part of the trial court in denying the motion for new trial on these grounds. See *Ellis v. State*, 316 Ga. App. 352, 360-361 (5) (729 SE2d 492) (2012) (deputy's alleged gestures or facial expressions during defendant's testimony did not prejudice defendant where trial record did not reflect any inappropriate gestures by the deputy, trial court had no memory or knowledge of any such behavior, and there was no evidence that the jury witnessed any alleged gestures or facial expressions by the deputy).

6. Lastly, Allen contends that the trial court erred by permitting the State a wide latitude in cross-examining Dr. Farrar, while defense counsel was not afforded

the same opportunity to challenge the credibility of the detective. We discern no reversible error.

Here, the trial court prohibited defense counsel from examining the detective on: (1) Allen's prior trial, in which the detective initially testified that she had not requested medical examinations of the victims; (2) an unrelated criminal case in which the detective continued questioning a defendant after he indicated wanting to speak with an attorney; and (3) an unrelated criminal case in which the detective had allegedly omitted unfavorable portions of a transcript reflecting her interactions with a defendant.[7]

Evidence used to attack a witness's credibility "may refer only to character for truthfulness or untruthfulness." OCGA § 24-6-608 (a) (1). "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than a conviction of a crime . . . or conduct indicative of the witness's bias toward a party may not be proved by extrinsic evidence." OCGA

---

[7] In the trial court, Allen's counsel attempted to introduce evidence of these purported acts pursuant to OCGA § 24-4-404 (b), which pertains to evidence admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Defense counsel argued, secondarily, that he should be allowed to cross-examine the detective under OCGA § 24-6-608. As Allen only pursues the latter argument on appeal, we limit our analysis to that section of the Code.

22

§ 24-6-608 (b). "Such instances may however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . [c]oncerning the witness's character for truthfulness or untruthfulness." OCGA § 24-6-608 (b) (1). "Because OCGA § 24-6-608 (b) places the decision whether to admit specific instances of conduct within the trial court's discretion, we will reverse the trial court's ruling only on a clear abuse of that discretion." (Citation omitted.) *Gaskin v. State*, 334 Ga. App. 758, 762 (1) (a) (780 SE2d 426) (2015).

Pretermitting whether questioning pertaining to these instances of conduct was permissible on direct and re-direct examination in this case, given that *Allen* was the party that called the detective as a witness, Allen's argument still does not compel reversal. First, defense counsel ultimately cross-examined the detective, through impeachment, on the issue of the medical examination, and the detective explained that she had forgotten that an examination had been conducted on T.A. Next, with regards to the case in which the detective questioned a defendant after he requested to consult with an attorney, we do not see how such conduct is relevant, whether directly or inferentially, to the detective's character for truthfulness under OCGA §

24-6-608. See *Gaskin v. State*, 334 Ga. App. 758, 763 (1) (780 SE2d 426) (2015) (acts probative of truthfulness include forgery, perjury, and fraud).

Lastly, even assuming the trial court erred in excluding the evidence from the final case, which involved missing portions of a transcript, any error was harmless because "it is highly probable that the error did not contribute to the verdict." *Gaskin*, supra, 334 Ga. App. at 761 (1). "[W]hen we determine whether or not an error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict." (Citations, punctuation, and footnotes omitted.) *Dimauro v. State*, 341 Ga. App. 710, 716 (1) (801 SE2d 558) (2017).

We first note that the excluded conduct was not undisputed, as the State represented that in that separate case, the detective had provided "the entire file" to the office of the district attorney and had not withheld portions of any transcript, and that the incident "was not a police department issue." More significantly, however, we remain cognizant that the jury viewed the footage of the forensic interviews, and heard testimony from T.A., L.A., the forensic interviewer, the responding police officer, and the two maternal aunts in whom the victims had confided regarding Allen.

Given the evidence presented to the jury from numerous other sources, it is highly probable that any error in excluding the proffered evidence had no influence on the verdict, and thus, the purported error was harmless. *Krirat v. State*, 286 Ga. App. 650, 654 (1) (649 SE2d 786) (2007). We therefore conclude that reversal is not warranted on this issue.

For the preceding reasons, the trial court's denial of Allen's motion for a new trial is affirmed.

*Judgment affirmed. Andrews, J., and Senior Appellate Judge Beasley concur.*