## A09A1405. ADEM v. THE STATE.

(686 SE2d 339)

PHIPPS, Judge.

Khalid Misri Adem was convicted of first degree cruelty to children[1] and aggravated battery[2] for removing his daughter's clitoris. On appeal, he contends that the trial court erred in rejecting his claim of ineffective assistance of counsel.

To prevail on an ineffectiveness claim, a defendant must establish, pursuant to *Strickland v. Washington*,[3] that counsel's performance was deficient and that the deficient performance was prejudicial to his defense.[4]

> To meet the first prong of this test, a defendant must overcome the strong presumption that his counsel's performance fell within a wide range of reasonable professional conduct and his counsel's decisions were made in the exercise of reasonable professional judgment. The inquiry focuses on the reasonableness of counsel's conduct from counsel's perspective at the time of trial and under the circumstances of the case.[5]

Both the performance and prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact.[6] In reviewing a trial court's determination regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[7] Adem has not shown that the trial court erred by rejecting his ineffectiveness claim, and we affirm.

At trial, the state called as a witness the child's mother, who by then was Adem's former wife. She testified that she had married Adem in 1997 and that their daughter was born about two years later. A few days after their child turned three years old, Adem moved out of their home. Several months later, in January 2003, Adem called and asked to pick up their daughter. The child's mother refused, and an argument ensued. The mother reminded Adem that he had mentioned wanting to circumcise their daughter. She told Adem, who had been born in Ethiopia and lived there until he was a

---

[1] OCGA § 16-5-70 (b).

[2] OCGA § 16-5-24.

[3] 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984).

[4] *Conaway v. State*, 277 Ga. 422, 424 (2) (589 SE2d 108) (2003).

[5] *Williams v. State*, 265 Ga. 681, 682 (1) (461 SE2d 530) (1995) (citations and punctuation omitted).

[6] *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[7] Id. at 88 (4).

teenager, that "because of [his] culture" she was afraid that he would have their daughter circumcised. He retorted, "How do you know I haven't already done it?" Then he added, "What's already been done is done."

Beginning the next day, the mother took the child for a series of medical examinations, which confirmed that the child's clitoris had been removed. Only a "very thin line" remained as minimal scarring.

The child's mother recollected at trial only one extended time period when Adem had spent an unusual amount of time taking care of, including diapering, their daughter. For about a week in October 2001, Adem had stayed home from work and not taken their daughter to any daycare, saying only that he wanted to spend time with his daughter.

The mother testified that, in light of the medical information she had learned about her daughter, she began taking her to a psychotherapist. That mental health professional testified at trial for the state as an expert in child trauma and child memory, as well as forensic interviewing and evaluating. The expert testified that during a forensic interview in March 2003, the child disclosed that her father had cut her "lun-lun," a word the child used to refer to her private area. The expert further opined that it was possible for the then three-year-old to have had an accurate memory of something that had been done to her more than a year earlier. She testified that children about two years old "can remember impactful episodes more acutely than they can remember ordinary episodes." The expert also testified that, during the next two years of therapy, the child never recanted her disclosure. A video of the forensic interview was shown to the jury.

The state also called the child to the stand. Then seven years old, the child maintained, "[My father] cut my private part." The child's mother, who had conducted extensive research on female genital mutilation (FGM), was allowed to testify as an expert regarding the prevalence of FGM in certain African countries. She estimated that 90 percent of the female population in Adem's home country of Ethiopia had been subjected to the practice.

The counts of which Adem was convicted alleged that he had committed the underlying act between September 1 and October 31, 2001. He took the stand, denying the charges, denouncing FGM, and testifying that he had not stayed home from work as his wife had testified or for any prolonged period during the two-month time frame set forth in the indictment. To further buttress his defense, Adem called two expert witnesses, one in the field of FGM and the other in several fields related to psychology.

At the motion for new trial hearing, Adem's trial lawyer was the

sole witness. He revealed the defense trial strategies and tactics. He testified that the defense had not focused on whether Adem's child had been a victim of FGM. Instead, the overall defense was that Adem had not committed the act; it had been done by the child's maternal grandmother. He testified that this theory was supported by several facts, including (i) the grandmother had been one of the three primary caretakers (in addition to the child's parents) for his daughter and thus had significant access to the child; (ii) the grandmother was from a "particular area" of Africa that practiced female circumcision; (iii) research, as interpreted by the lawyer, had shown that in various African countries, female circumcisions were primarily performed by elderly women, not by men; (iv) such a procedure would have required some level of skill to avoid complications such as infections or death; and (v) the grandmother worked as a registered nurse at a hospital and thus arguably had the requisite skills and medical supplies.

1. Adem argues that his attorney performed deficiently by failing to introduce into evidence certain of his employment time sheets, asserting that such records would have proved that he had not been absent from work during the time frame alleged in the indictment. At trial, Adem's lawyer sought to authenticate those documents through a witness who had assisted in checking and maintaining time sheets at Adem's work place. Because the witness testified that he could not identify the proffered documents as true and correct copies of such employment time sheets, the court disallowed the documents in evidence.

Adem's defense lawyer, whose practice was composed of about 50 percent criminal law, had also represented Adem in connection with his divorce, which became final in August 2003. The lawyer testified at the new trial hearing that, at Adem's divorce trial, the same witness had laid an adequate foundation for the documents, and they were admitted in evidence. The lawyer recounted that, in preparing for Adem's criminal trial, he had obtained confirmation from this witness that the witness remained "on the same page with [him]." The lawyer testified that, under those circumstances, he had expected the witness to again give testimony that would lay an adequate foundation.

Adem's post-trial lawyer called no witness at the new trial hearing to authenticate either the excluded documents or any other documents as Adem's time sheets showing whether Adem had been absent from work for any significant period during the pertinent time frame. Thus, Adem failed to demonstrate the claimed deficient

performance by his trial lawyer.[8]

2. Adem argues that his trial counsel performed deficiently by calling a witness who qualified as an expert in FGM, claiming that her testimony did not buttress his defense, but instead bolstered the state's case. Adem asserts that the expert's revelation that her own daughter had been mutilated by her former husband was antithetical to his defense, citing this portion of the witness's testimony:

> I have worked in the area of female genital mutilation for a little over 17 years today. I started doing this work when my first daughter was seven years old and was to have been mutilated by my ex-husband, which was also the very same reason why I separated from the marriage, because I disallowed my daughter from being circumcised. And so that prompted my interest in doing further work in this area of female genital mutilation.

At the new trial hearing, Adem's trial lawyer recounted that he had consulted a great deal with this witness prior to trial; he explained further that he had called her as an FGM expert to support that aspect of Adem's defense that Adem, having had no medical training, could not have performed the act and that his ex-wife's mother could not be excluded as the perpetrator.

Accordingly, at Adem's trial, the lawyer elicited testimony from the FGM expert that female circumcision was practiced not only in Adem's home country of Ethiopia, but also, albeit sparingly so, in the African country from which the child's mother and maternal grandmother had come. The lawyer further elicited from the expert testimony that female circumcisions traditionally are performed by individuals with certain "expertise" — either trained elderly women or male "traditional healers"; the latter, she defined as "like the doctors in the villages before the coming of western medicine." The expert, who had witnessed numerous female circumcisions, testified that she had never seen an untrained man perform that procedure, explaining that "you have to be trained to be able to know how to

---

[8] See *Watkins v. State*, 285 Ga. 355, 357 (2) (676 SE2d 196) (2009) (when ruling on a claim of ineffective assistance, this court does not evaluate counsel's trial tactics and strategic decisions in hindsight); *Smith v. State*, 294 Ga. App. 692, 703 (10) (a) (iii) (670 SE2d 191) (2008) (where purported time sheets were not made a part of the record, it was impossible for appellate court to determine whether they would have helped the defense and therefore appellant failed to establish that his trial lawyer performed deficiently for not introducing them at trial); *Ponder v. State*, 201 Ga. App. 388, 389 (1) (411 SE2d 119) (1991) (where appellant fails at the hearing on his motion for new trial to make any proffer of an uncalled witness's testimony, it cannot possibly be said that there would have been testimony favorable to appellant).

712

perform the procedure."

When asked at the new trial hearing about that part of her testimony about which Adem now complains, the witness expounded that it had not been her former husband who wanted their daughter circumcised; "[i]t was my mother-in law who wanted my daughter circumcised because that's a subject the women discuss." The expert stated that she had refused the demand of her mother-in-law, moved with her daughter to her own parents' home, and was told by her mother-in-law not to come back to their house.

"In the realm of specific decisions regarding trial strategy, and in particular decisions about which witnesses should be called to testify, defense attorneys are afforded wide discretion."[9] Because the decision to call this expert witness in Adem's defense was not unreasonable,[10] Adem has shown no deficient performance.

3. Adem argues that his trial attorney performed deficiently by calling another witness, a clinical psychologist. Adem asserts that his lawyer failed to adequately investigate the psychologist's background, complaining that the psychologist had been suspended from his profession and that the state's examination revealed that the psychologist had authored a book with a "crass" and "flippant" title: "Screw Your Spouse, Win the Kids, and Make Money Doing It."

The psychologist acknowledged, when asked by the state, that he had been ordered to suspend giving testimony in "the narrow area of child custody," but reported further that he had appealed that ruling, that the decision was subsequently vacated by this court, and that his case had been remanded to the trial court for further consideration.[11] The psychologist steadfastly maintained that, notwithstanding that pending matter, he remained in good standing with the state licensing board.

Regarding his book, the psychologist testified that it dealt with "suggestibility and describes the strategies of winning children in custody battles by setting up false memories and suggestibility," areas which he claimed to have thoroughly researched for four years while working on the book. The psychologist further testified that his book reviewed a series of case studies, wherein one parent had planted false accusations against the other parent in order to gain

[9] *Simpson v. State*, 277 Ga. 356, 359 (4) (c) (589 SE2d 90) (2003) (footnote omitted).

[10] See *Fuller v. State*, 278 Ga. 812, 814-815 (2) (c) (607 SE2d 581) (2005) (reasonable trial strategies and tactics do not amount to ineffective assistance of counsel); *Watkins*, supra at 358 (the decision as to which defense witnesses to call is a matter of trial strategy and tactics, and tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances).

[11] See *Farrar v. Ga. Bd. of Examiners of Psychologists*, 280 Ga. App. 455 (634 SE2d 79) (2006).

custody of their children and that, in many of those cases, the plotting parent was awarded not only custody of the children, but also a hefty child support award. When asked by the state on cross-examination about the title, he characterized it as satirical and stated that it was a parody of "the way the system works right now, how you can help plant false accusations and allegations."

At the new trial hearing, Adem's trial lawyer explained that he had called the psychologist to support that aspect of Adem's defense of discrediting what had been presented to the jury as the child's memory. Accordingly, after extensive voir dire at trial by the defense and prosecution, Adem's lawyer presented (and the court accepted) the witness as an expert in child psychology, forensic interviewing of children, memory recall in children, false memories, and false beliefs. Next, Adem's lawyer elicited testimony from the expert that, after viewing several times the video of the forensic interview of Adem's child, he had concluded that the interview had been conducted improperly in many regards, which he detailed to the jury. The expert pointed to, among other things, instances in which he claimed the interviewer had demonstrated bias against the father and in favor of the mother and had otherwise made impermissible suggestions to the child that her father had hurt her. In addition, the expert cited areas that he claimed the interviewer should have explored with the child, given her responses and emotional reactions during the interview.

The expert testified that, generally, children the age of Adem's daughter when interviewed have "very unreliable, very inconsistent" memories; that what they hear others say, particularly adult authority figures, "becomes their memory." He stated that because of this and other potential intervening variables, it is essential to interview such a young child as soon as possible after the traumatic event. The expert opined that there appeared to be a great possibility that Adem's child's allegations made during the forensic interview had been contaminated by improper influences, including "something that was told to her prior to the interview," as well as "leading questions and words that were fed her during the forensic interview."

Adem's trial lawyer conceded at the new trial hearing that he had not known about the psychologist's licensing issue, but nevertheless insisted that the defense needed expert testimony to discredit the evidence of the child's memory. Furthermore, the lawyer recalled that he had been unable to obtain another expert in the pertinent areas, that Adem had no money, and that a request for additional funds had been denied. The lawyer testified, "So even if I would have known [about the psychologist's licensing issue], I still would have brought him in. It's better to have him, in my opinion, than nothing

else at all.''

Under these circumstances, the trial court was authorized to conclude that calling the psychologist as a defense witness fell within the broad spectrum of reasonable trial strategy and that no deficient performance was shown.[12]

4. Adem's criticism of the way his trial counsel phrased some of the questions he posed to witnesses falls short of demonstrating deficient performance.[13]

5. Adem argues that his trial counsel performed deficiently by injecting his character in evidence. Specifically, Adem complains that his lawyer introduced evidence that during his marriage, his wife twice obtained restraining orders against him and evidence that in 1997, he was deported.

Adem's trial lawyer testified at the new trial hearing that the evidence was adduced to demonstrate a pattern of the child's mother's ongoing vindictive conduct, which had begun during the divorce proceedings and which had the objective of preventing Adem from seeing his child. This conduct included taking out restraining orders against him on two separate Valentine's Days; and initially accusing him regarding their child's FGM at a family dinner with his mother when she was visiting from Ethiopia. The defense thereby sought to show that the child's mother was capable also of making false accusations against Adem.

Regarding the deportation, the lawyer testified that the evidence was presented merely to trace for the jury Adem's time spent in Ethiopia and the United States. The lawyer had not believed that Adem's deportation was particularly damaging. The trial transcript reveals that a few months after Adem married, he was deported because his work visa had expired; and that his wife joined him for several months in Ethiopia, where they had a second wedding ceremony before settling into their home in Georgia.

The cited evidentiary decisions by trial counsel fell under the rubric of trial strategy and tactics. Pretermitting whether such decisions were unreasonable, there is no reasonable probability that the outcome of Adem's trial would have been different but for evidence of the two restraining orders and his deportation.[14]

---

[12] See *Thomas v. State*, 284 Ga. 647, 650 (3) (b) (670 SE2d 421) (2008) (the decision of how to deal with the presentation of an expert witness by the opposing side, including whether to present counter expert testimony, to rely upon cross-examination, to forego cross-examination and/or to forego development of certain expert opinion, is a matter of trial strategy which, if reasonable, cannot be the basis of a successful ineffective assistance of counsel claim).

[13] See *Phillips v. State*, 285 Ga. 213, 222 (5) (h) (675 SE2d 1) (2009) (decisions on whether and how to conduct witness examinations are strategic and tactical).

[14] See *Lajara v. State*, 263 Ga. 438, 440-441 (3) (435 SE2d 600) (1993) (a court addressing the ineffective assistance issue is not required to approach the inquiry in any particular order

*Judgment affirmed. Smith, P. J., and Bernes, J., concur.*

DECIDED NOVEMBER 2, 2009.

*McKenney & Froelich, Jerome J. Froelich, Jr., Adam M. Hames*, for appellant.

*Daniel J. Porter, District Attorney, Wesley C. Ross, Assistant District Attorney*, for appellee.

---

or even to address both components if the defendant has made an insufficient showing on one).