**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be**
**_physically received_ in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 25, 2019**

# In the Court of Appeals of Georgia

A19A0797. REYES-CASTRO v. THE STATE.

REESE, Judge.

Following a joint trial, a jury found Castro Eric Reyes, a/k/a Eric Fernando Reyes-Castro (hereinafter, "Reyes"), and Andy Carcamo Maradiaga ("Carcamo") guilty of the kidnapping and rape of an unconscious 21-year-old woman ("the victim").[1] On appeal from the denial of his motion for new trial, Reyes contends that he received ineffective assistance of counsel. For the reasons set forth infra, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the evidence showed that, in November 2014, Reyes and Carcamo jointly kidnapped the extremely

---

[1] See *Carcamo v. State*, 348 Ga. App. 383 (823 SE2d 68) (2019).

[2] See *Carcamo*, 348 Ga. App. at 383.

intoxicated and unconscious victim, whom they did not know, from a Savannah nightclub and that Carcamo raped her in the back seat of Reyes's car while Reyes sat in the driver's seat. While Carcamo was raping the victim, Reyes texted a friend, stating that he was planning to rape the victim, also, and inviting the recipient of the text to join him and Carcamo. However, police officers (who had been alerted after a bystander saw the men carrying the unconscious victim to the car) arrived at the scene while Carcamo was still raping the victim. Carcamo and Reyes were arrested and charged with kidnapping and raping the victim. Following their convictions on the charges and the denial of their motions for new trial, both men appealed to this Court.

On January 14, 2019, this Court issued an opinion in the appeal filed by Carcamo, affirming the denial of his motion for new trial.[3] The opinion recited the following facts, which provide specific, material details of the crimes and were supported by evidence presented during Reyes's and Carcamo's joint trial.[4]

> [O]n the night of November 29, 2014, the victim and her twin
> sister were celebrating their twenty-first birthdays with friends in the

---

[3] *Carcamo*, 348 Ga. App. at 383-397, petition for certiorari filed on February 4, 2019, in the Supreme Court of Georgia, Case No. S19C0701.

[4] See id.

2

downtown area of Savannah, Georgia. The celebration lasted into the early morning hours of November 30, 2014, and the victim became heavily intoxicated. Around 2:18 a.m., the victim and one of her friends were escorted out of a club after an employee discovered them sitting on a back stairwell that was not open to patrons. According to the employee, the victim and her friend were noticeably intoxicated, and he "had to hold them up while bringing them out" of the club. Once outside the club, the victim remained near the front door because she was unable to stand on her own and kept falling down. While outside, the victim became separated from her friend.

Carcamo and his friend[, Reyes,] were at the same club that night. Carcamo was standing near the front door of the club when he saw the victim repeatedly fall to the ground after the employee escorted her outside. Carcamo and Reyes approached the victim, supported her on her feet, and "were trying to take her" when a club employee who believed the situation was a "little sketchy" began questioning them. Carcamo and Reyes assured the employee that the victim "was their good friend and they would take care of her," and the employee let them go. Carcamo and Reyes placed the victim's arms over their shoulders and supported her weight between them as they walked with her away from the club while her head hung toward the ground.

After walking away from the club, Carcamo lifted up the victim and carried her down the street as Reyes followed behind them while talking on his cell phone. When they reached the parking lot where Reyes's car was parked, Reyes unlocked his vehicle and opened the door, and Carcamo placed the victim on the back seat, where he had

3

sexual intercourse with her while she was unconscious. Reyes stayed on his cell phone and got in and out of the front seat of the car.

A military serviceman who was walking in the area saw Carcamo carrying the unconscious victim down the street followed by Reyes on his cell phone. According to the serviceman, Carcamo kept looking back at Reyes and nodding for him to hurry up. Because something "did not seem right," the serviceman followed them until they arrived at Reyes's car. The serviceman could not see what then occurred in the back seat because the windows were fogged from the inside, but he saw Reyes on his phone getting in and out of the car.

The serviceman left the scene and located two police officers about a half a block away from the parking lot, and he told them what he had observed. The two officers immediately proceeded to the parking lot on foot and were joined by another officer and a detective who were already in the area. The officers and the detective approached the parked car and saw Reyes in the front seat and Carcamo in the back seat having sexual intercourse with the unconscious victim. Reyes got out of the car and claimed not to know Carcamo or the victim. Carcamo pulled up his pants and got out of the car, but the victim remained motionless in the back seat with her genitals exposed. According to one officer, the victim "appeared lifeless, was not moving, and at that point I couldn't even tell if she was breathing or not." The detective described the victim as "exposed, unconscious, [and] not moving" and testified that he "didn't know if she was . . . dead or alive at that point." After several minutes, the detective was able to get the victim to sit up, but she vomited several times, drifted in and out of consciousness, spoke incoherently, and could not stand up. The detective used the victim's cell phone to call her sister,

and the victim's sister and friends then came to the scene and told the detective that they did not know Carcamo and Reyes and did not know why the victim would have been with them.

Carcamo and Reyes were detained and taken to police headquarters, while the victim was transported by ambulance to the hospital. The detective went to the hospital and interviewed the victim, who was still heavily intoxicated at that point and did not remember what had happened. The interview was audio-recorded and was later played for the jury, and the victim testified at trial that she did not know Carcamo and Reyes and had no memory of what had occurred with them that night.

A nurse at the hospital performed a sexual assault examination on the victim and noted that she was heavily intoxicated, was in and out of consciousness, was disoriented, and had vomit in her hair, a red mark on her shoulder, bruising on her knee, and dirt on her leg. The nurse took vaginal and other swabs from the victim as well as blood and urine samples. A blood toxicology test showed that the victim had a blood alcohol level of 0.197 grams per 100 milliliters, which, according to a forensic toxicology expert who testified at trial, would have been between 0.242 and 0.272 grams per 100 milliliters approximately three hours before the victim's blood was drawn. The toxicologist opined that[,] at that blood alcohol level, the average social drinker would experience mental confusion, double or blurred vision, heavily slurred speech, and lack of muscle coordination.

After interviewing the victim at the hospital, the detective went to police headquarters, where Reyes agreed to an interview. Reyes told the detective that he and Carcamo were friends but had arrived

separately at the club; that Carcamo introduced the victim as his girlfriend; that Carcamo asked him for a ride home; and that he had agreed to provide Carcamo a ride. Reyes said that he did not know the victim's name, and at one point during the interview, according to the detective, Reyes "shook his head and mentioned something about being stupid or doing something stupid, something to that effect." Although Reyes initially claimed that all three of them had walked to the car, Reyes later admitted that the victim had not walked. Reyes also said that when they were in the car, he had been talking to his girlfriend and texting on his cell phone, and he had heard Carcamo and the victim talking and having sex in the back seat.

The detective seized Reyes's cell phone, and a digital forensic examination of the phone was conducted after a search warrant was obtained. During the approximate time period when the victim was inside Reyes's car, Reyes's phone contained incoming and outgoing calls to a "Carlos Gomez," as well as a text message written in Spanish to "Carlos" using the WhatsApp Chat application. The text message, when translated into English by an expert translator at trial, read: "Carlos, a drunken broad landed here. Bring the sweater and we're going to mount her." The translator testified that "sweater" in this context could be slang for "condom."

Reyes agreed to [another] interview with the detective, who confronted him with the text message. Reyes admitted that one of the Spanish phrases in the text message referred to "a girl who was really drunk" and that another phrase meant "to fuck." Reyes initially denied that he had planned to have sex with the victim, but then admitted, when

the detective confronted him with the specific wording of the text message, that he and Carcamo "were going to have sex with the girl."

. . .

As part of his investigation, the detective also obtained video camera footage from several locations in the downtown Savannah area, including footage from the club, a nearby restaurant, and the city's street cameras. The detective compiled a single video of the relevant time periods from the video camera footage, which was introduced as an exhibit at trial by stipulation of the parties and played for the jury. Among other things, the video footage showed Carcamo and Reyes walking away from the club with the victim between them with her arms over their shoulders as her head hung toward the ground, and Carcamo then carrying the motionless victim down the street as Reyes followed him.

Carcamo and Reyes were [jointly] indicted on charges of rape[5] and kidnapping. . . . At the ensuing joint trial, after the State presented its case-in-chief, Reyes elected not to testify. Carcamo took the stand and testified that he and Reyes had come to the club in Reyes's car and that they had been at the club with another friend named Carlos Gomez. Carcamo testified that he approached the victim after she fell outside the club and her friend left, and he admitted that the victim had been drunk, that she had trouble walking, that he had picked up the victim and carried her, that he put her in the car, and that he had sex with her. However, Carcamo claimed that the victim was "[d]runk, but not

---

5 The indictment charged Carcamo and Reyes "individually and as parties concerned in the commission of a crime, with the offense of rape[.]"

7

unconscious," that he had initiated the sexual encounter after they briefly talked in the back seat of the car, and that he did not force the victim to have sex with him.[6]

After the jury found Reyes and Carcamo guilty of rape[7] and kidnapping, Reyes filed a motion for new trial, asserting that he received ineffective assistance of counsel in several respects. The trial court conducted a hearing, then denied the motion. In its order, the trial court found no merit to many of Reyes's claims that his trial counsel's performance was deficient. The court also found that, regardless

---

[6] *Carcamo*, 348 Ga. App. at 383-387 (footnotes omitted).

[7] At trial, the court instructed the jury on the law as to parties to a crime, pursuant to OCGA § 16-2-20 (a) and (b), and OCGA § 16-2-21, as well as mere presence and mere association. See OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime."); (b) ("A person is concerned in the commission of a crime only if he: (1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime."); see also OCGA § 16-2-21 ("Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto, although the person claimed to have directly committed the crime has not been prosecuted or convicted, has been convicted of a different crime or degree of crime, or is not amenable to justice or has been acquitted."). Given that there was no evidence that Reyes actually had sexual intercourse with the victim, the jury apparently found Reyes guilty of rape as a party to the crime.

whether any of the alleged performance issues had merit, given the overwhelming evidence of Reyes's guilt, Reyes had failed to meet his burden of showing that, but for such deficient performance, there was a reasonable probability that the outcome of the trial would have been different.

On appeal from the trial court's order, Reyes contends that the trial court erred in rejecting his claims of ineffective assistance of counsel. We disagree.

> In order to establish ineffectiveness of trial counsel, [the] appellant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. There is a strong presumption that the performance of trial counsel falls within the wide range of reasonable professional assistance. The reasonableness of the conduct is viewed at the time of trial and under the circumstances of the case. In reviewing a lower court's determination of a claim of ineffective assistance of counsel, we give deference to the trial court's factual findings, which are upheld on appeal unless clearly erroneous; however, we review the lower court's legal conclusions de novo.[8]

With these guiding principles in mind, we turn now to Reyes's specific claims of error.

---

[8] *Williams v. State*, 277 Ga. 853, 857 (6) (596 SE2d 597) (2004) (citations and punctuation omitted).

1. Reyes contends that his trial counsel "[f]ailed to litigate properly the motion to suppress [the contents of his cell phone] by not raising all reasonable arguments for exclusion of the evidence." Specifically, Reyes argues that his counsel was deficient for failing to argue that the contents of the cell phone had to be suppressed because (a) the detective's seizure of Reyes's cell phone prior to Reyes's arrest was illegal; and (b) the search warrant obtained by the detective was "impermissibly overbroad[.]"

The record shows that the detective first interviewed Reyes at 6:14 a.m. on November 30, 2014, a few hours after the detective and the other officers had appeared at Reyes's car and interrupted Carcamo's rape of the victim. According to the detective, Reyes was "sober and coherent[ ]" at the time he was transported to police headquarters, where the interview was conducted. During the interview, Reyes admitted, inter alia, that he had been sitting in the front seat of his car, texting messages and talking to his girlfriend on his cell phone, while Carcamo was having sex with the victim in the back seat. Based on that information, the detective believed that the text messages Reyes sent during the rape might contain evidence critical to the investigation of the rape, such as establishing a timeline for the night's events. Further, given his extensive experience as a sexual assault investigator, the detective

believed that Reyes might have video recorded or photographed the rape. Thus, although Reyes was not placed under arrest following the first interview, the detective seized Reyes's cell phone and obtained a search warrant for the contents of the phone.

The detective's search warrant affidavit provided a comprehensive statement of facts the detective had gleaned from his investigation between the date of the rape, November 30, and the date he obtained the search warrant, December 2. The affidavit also stated that "[t]he affiant believes that the requested search of [Reyes's] cell phone will reveal evidence critical to this investigation. In addition, the call and text content on the phone will assist in establishing a timeline for the incident." Based on the detective's affidavit, the judge of the recorder's court issued the search warrant, which authorized a search of Reyes's cell phone for "[a]ny and all content [of the phone]; [a]ny and all digital content; [a]ny and all data, to include deleted or recoverable data; [a]ny and all text message content; [c]all logs; [a]ny and all media content, to include videos and photographs, which are being possessed in violation of Georgia Law(s): OCGA § 16-6-1 Rape[.]"

On December 9, the detective took Reyes's cell phone to Armstrong Atlantic State University's Cyber Forensics Division ("AASU"), which conducted a "digital forensics download[ ]" of the phone's content, including all texts, call logs,

11

photographs, and video recordings. According to an AASU analyst, once she downloaded the phone's content into a file, "[t]he information that [she] looked at for [the detective] was [limited to] the events of November 29th into the early morning hours of November 30th." The analyst testified that she "bookmarked [items] as being possibly important [to] the investigation[.] . . . [She] chose the items that fell in the timeline of the alleged [crime] for the [detective] to then take to a translator."[9]

On December 17, the detective picked up Reyes's cell phone and the file containing the downloaded digital content obtained by AASU. After reviewing the data marked by the AASU analyst, the detective obtained an arrest warrant for Reyes for being a party to the crime of rape, and Reyes was arrested on December 19, 2014. Once Reyes was in custody, the detective interviewed him again and confronted him with the text message that stated (after being translated to English): "Carlos, a drunken broad landed here. Bring the sweater and we're going to mount her."[10] Forty-seven seconds after Reyes sent the text, he received a single-word response,

_____

[9] The analyst testified that all of the information in the cell phone was in Spanish and that she was not fluent in Spanish.

[10] As shown above, during the custodial interview with the detective, Reyes admitted that the message meant that he was going to "have sex with" the victim, "who was really drunk." Reyes does not challenge the admissibility of this statement on appeal.

12

"Donde?" or, in English, "Where?" After being confronted with the messages, Reyes admitted that he had intended to have sex with the victim on the night of the rape. It is undisputed that Reyes's text message, and the brief response, were the only messages from Reyes's cell phone that the State presented as evidence of the crimes charged at trial.[11]

(a) Reyes argues that, when the detective seized Reyes's cell phone prior to arresting him, the detective had no basis to believe that the phone contained evidence regarding the rape. He contends that, instead, the detective seized the phone in the mere hope of finding evidence that would provide probable cause to arrest Reyes, and argues that such hope was comparable to a "hunch[ ]" that would be insufficient to

---

[11] However, Reyes's trial counsel introduced into evidence the unredacted page from the digital download that showed all text messages and phone calls to and from Reyes's cell phone from 2:00 a.m. to 8:38 a.m. on November 30, 2014. Then, after Reyes's trial counsel cross-examined the State's expert translator as to whether consideration of the surrounding text messages might change the meaning of the messages at issue, the State showed the translator those text messages to establish the context. The State then asked him if anything in the surrounding texts changed his interpretation of the messages at issue, to which the translator responded, "No, it doesn't."

In addition, the State introduced four photos of Reyes that had been extracted from the phone. The record shows that the photos were of Reyes, fully clothed and standing alone in different places, but did not show when or where the photos had been taken. The photos were introduced without objection, and Reyes does not assert any error on appeal related to the admission of the photos.

permit the seizure and search of the phone. Thus, Reyes contends that his counsel's representation was deficient for failing to challenge the allegedly illegal seizure of the cell phone in the trial court.

Pretermitting whether Reyes's trial counsel failed to raise and argue this issue in the trial court,[12] the mere failure to present an argument in a motion to suppress does not constitute per se ineffective assistance of counsel.[13] Instead, the appellant bears the burden of making a strong showing that, if his counsel had presented the argument, the trial court would have suppressed the evidence.[14]

It is axiomatic that, in ordinary cases, "seizures of personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless

---

[12] The record shows that, during the pre-trial motion to suppress hearing, Reyes's trial counsel argued to the trial court that the seizure and search of the cell phone constituted an illegal "fishing expedition," because the detective did not know what data was on the phone at the time he seized it and obtained the search warrant.

[13] See *Mayes v. State*, 229 Ga. App. 372, 373 (1) (494 SE2d 34) (1997) ("It is clearly settled that the mere failure to file a suppression motion does not constitute per se ineffective assistance of counsel.") (citation, punctuation, and emphasis omitted).

[14] See id.

14

accomplished pursuant to a judicial warrant, issued by a neutral magistrate after

finding probable cause."[15] However,

> [w]here law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a [search] warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.[16]

"Such exigencies could include the need to prevent the imminent destruction of

evidence in individual cases[.]"[17] According to the Supreme Court of the United

States, "[w]hen faced with special law enforcement needs, diminished expectations

---

[15] *Illinois v. McArthur*, 531 U. S. 326, 330 (II) (A) (121 SCt 946, 148 LE2d 838) (2001) (citation and punctuation omitted).

[16] *United States v. Place*, 462 U. S. 696, 701 (II) (103 SCt 2637, 77 LE2d 110) (1983). See *Riley v. California*, 573 U. S. 373, 402 (IV) (134 SCt 2473, 189 LE2d 430) (2014) (One exception to the search warrant requirement is when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.") (citations and punctuation omitted).

[17] *Riley*, 573 U. S. at 402 (IV).

of privacy, minimal intrusions, or the like, . . . certain general, or individual, circumstances may render a warrantless search or seizure reasonable."[18]

In *Riley v. California*,[19] the Supreme Court addressed such "special law enforcement needs"[20] when considering whether police officers were authorized to conduct a *warrantless* seizure and search of a person's cell phone incident to his or her arrest absent the presence of another exception to the warrant requirement. The Court concluded that, in such circumstances, a warrant was required before the phone could be searched.[21] However, in addressing the government's concerns that, under such rule, an arrestee might delete incriminating data from the phone while the officer is obtaining the warrant, the Court acknowledged that the officer who arrested the person "could have seized and secured [the arrestee's] cell phone[ ] to prevent destruction of evidence while seeking a warrant. . . . And once law enforcement

---

[18] *McArthur*, 531 U. S. at 330 (II) (A).

[19] 573 U. S. at 378, 381-403 (II)-(IV).

[20] *McArthur*, 531 U. S. at 330 (II) (A).

[21] See *Riley*, 573 U. S. at 386 (III).

16

officers have secured a cell phone, there is no longer any risk that the arrestee himself will be able to delete incriminating data from the phone."[22]

In so ruling,[23] the Supreme Court cited to *Illinois v. McArthur*,[24] which considered four principles in balancing an individual's privacy-related concerns with law enforcement-related concerns to determine if a police officer's seizure of a person's property until a search warrant could be obtained was reasonable when that person was not under arrest.[25] And, applying those principles in the instant case, we hold that the record supports the following conclusions. First, given Reyes's statements during the first interview regarding his use of the cell phone during the rape, as well as the detective's experience in investigating sexual assaults of this nature, the detective had "probable cause to believe that [Reyes's cell phone]

---

[22] Id. at 388 (III) (A) (2). See also *Davis v. State*, 301 Ga. 397, 406 (6) (b) (801 SE2d 897) (2017) ("[W]hen officers observed [the defendant] manipulating the phone later during the interview, they seized it until they could obtain a search warrant. The United States Supreme Court has approved this reasonable preventative step to preserve evidence.") (citing *Riley*, 573 U. S. at 388-392 (III) (A) (2)).

[23] See *Riley*, 573 U. S. at 388, 391 (III) (A) (2).

[24] 531 U. S. at 331-333 (II) (A).

[25] See id.

17

contained evidence of a crime[.]"[26] Second, the detective had a reasonable basis to be concerned that, unless he seized the phone during the first interview with Reyes, Reyes would be able to destroy any incriminating data on his phone – or the phone itself – before the detective could obtain a search warrant.[27] Third, the detective "made reasonable efforts to reconcile [his] law enforcement needs with the demands of [Reyes's] personal privacy[, i.e., the detective] neither searched the [phone] nor arrested [Reyes] before obtaining a warrant."[28] And, fourth, the detective seized the phone for a "time period [that] was no longer than reasonably necessary for the [detective], acting with diligence,[[29]] to obtain the warrant[ ]"[30] and institute the search.[31]

---

[26] Id. at 331-332 (II) (A).

[27] See id. at 332 (II) (A).

[28] Id.

[29] Reyes has not argued that the detective failed to act with due diligence in obtaining the search warrant or in accomplishing the search of the phone.

[30] *McArthur*, 531 U. S. at 332 (II) (A).

[31] Cf. *Place*, 462 U. S. at 708-710 (III) (The Supreme Court ruled that the "prolonged 90-minute period" that police officers seized and detained a suspect's luggage at an airport while arranging to search it for narcotics was unreasonable because the officers knew when the suspect would arrive at the airport and could have made arrangements beforehand to minimize the amount of time the luggage was

Thus, under the particular circumstances presented in this case and the law enforcement interests at stake, we conclude that the detective was authorized to seize Reyes's cell phone in order to prevent the destruction of evidence and to retain it until the detective could obtain a search warrant and have the search conducted.[32] It necessarily follows that Reyes's trial counsel was not deficient for failing to challenge the detective's seizure of the cell phone prior to Reyes's arrest.[33] Moreover, Reyes has failed to make a strong showing that, if his trial counsel had challenged the

---

seized. Significantly, the Court also ruled that the seizure of the luggage "intrude[d] on *both* the suspect's possessory interest in his luggage *as well as his [personal] liberty interest* in proceeding with his itinerary[,]" finding that "such a seizure can effectively restrain the person since he is subjected to the possible disruption of his travel plans in order to remain with his luggage or to arrange for its return.") (emphasis supplied). We note that neither of the concerns that made the seizure in *Place* illegal was present in the instant case.

[32] See generally *McArthur*, 531 U. S. at 334 (II) (B) (The Supreme Court noted that it had "found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."); see also *Riley*, 573 U. S. at 388 (III) (A) (2).

[33] See *Burke v. State*, 316 Ga. App. 386, 389 (1) (a) (729 SE2d 531) (2012) ("Failure to make a meritless or futile objection or motion cannot be evidence of ineffective assistance.") (punctuation and footnote omitted).

19

detective's seizure of Reyes's cell phone, the trial court would have suppressed the evidence obtained from the phone.[34]

(b) Reyes also contends that the search warrant was "impermissibly overbroad[,]" because it authorized a search of all of the phone's digital content, instead of strictly limiting the search to obtaining data from the date and time of the alleged rape. According to Reyes, because the search warrant authorized a "general exploratory search[ ]" or "forensic examination" of all of his phone's content, his constitutional right to privacy was violated, and the contents of the cell phone, and all evidence derived therefrom, should have been suppressed. Reyes argues, therefore, that his counsel's failure to raise this issue in the motion to suppress filed and argued in the trial court constituted ineffective assistance.[35] We disagree.

---

[34] See *Mayes*, 229 Ga. App. at 373 (1).

[35] We note that, contrary to Reyes's suggestion otherwise, his trial counsel, citing *Riley*, argued during the motion to suppress hearing that the search and seizure of the cell phone constituted an overly broad and unreasonable search that violated Reyes's constitutional right to privacy. See *Riley*, 573 U. S. at 401 (IV) (When ruling that a police officer was not authorized to search an arrestee's cell phone incident to an arrest without a warrant, the Court stated: "Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest.").

[W]here the basis for the issuance of a search warrant has been challenged, [the Supreme Court of Georgia] has stated that doubtful cases should be resolved in favor of upholding the determination that issuance of a warrant was proper, reflecting both a desire to encourage use of the warrant process by police officers and a recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.[36]

In this case, although the search warrant authorized the search of "[a]ny and all [of the phone's] content[,]" the warrant also specifically stated that the issuing judge had concluded that there was probable cause[37] to believe that a crime had been committed based on the detective's affidavit's detailed summary of the crimes at issue and that evidence of such crimes was "presently located on the . . . property described

---

[36] *Smith v. State*, 296 Ga. 731, 734 (2) (a) (770 SE2d 610) (2015) (citation and punctuation omitted).

[37] See *Glispie v. State*, 300 Ga. 128, 132 (2) (793 SE2d 381) (2016) ("In determining whether probable cause exists to issue a warrant, a magistrate makes a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. [A] magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. . . . The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act.") (citations and punctuation omitted).

above[,]" i.e., Reyes's cell phone. In addition, the warrant stated that the digital content to be acquired from the phone was related to a "violation of Georgia Law(s): OCGA § 16-6-1 Rape[.]"

> [A]lthough a warrant cannot leave the determination of what articles fall within its description and are to be seized entirely to the judgment and opinion of the officer executing the warrant, the degree of specificity in the description is flexible and will vary with the circumstances involved. Specifically, the particularity requirement only demands that the executing officer be able to identify the property sought with reasonable certainty.[38]

Here, given the warrant's reference to the specific crime at issue and to the specific dates on which the crime was allegedly committed, as shown in the affidavit, we conclude that the warrant was sufficiently particular to notify the detective, the analyst, and/or any other executing officer of what evidence he or she was authorized to obtain from Reyes's phone and to prevent a general exploratory search of the other

---

[38] *Henson v. State*, 314 Ga. App. 152, 155 (723 SE2d 456) (2012) (punctuation and footnotes omitted).

downloaded content for evidence of unrelated crimes or other unauthorized purposes.[39] And, as the Supreme Court of Georgia has ruled,

[w]e do not believe that it was the intention of the Supreme Court of the United States to lay down a rule that the searching and seizing officer be left no room to make a judgment as to what particular documents or things are subject to seizure under the warrant which he is executing. It is difficult to imagine that a case could arise where an officer executing a valid search warrant would not at some stage in the matter be required in the very nature of things to exercise his judgment as to what thing or things or person or persons were to be seized under the warrant. We conclude that[,] so long as the determination which he is required to make is a determination of a matter of fact[,] as distinguished from a determination of a matter of opinion[,] the warrant is valid.[40]

Further, although the AASU analyst conducted a complete download of the phone's data, the analyst repeatedly testified at trial that the review of the phone's content was focused on the specific time period during which the rape occurred, i.e., from the evening of November 29, 2014, until the early morning hours of November

---

[39] See *Reaves v. State*, 284 Ga. 181, 184-188 (2) (d) (664 SE2d 211) (2008) (Warrants containing residual clauses limiting the items to be seized to those relevant to the crimes identified were sufficiently particular and did not authorize a general exploratory search in violation of the Fourth Amendment.).

[40] Id. at 187 (2) (d) (citation and punctuation omitted).

30, 2014. Moreover, as shown above, the only text messages presented at trial were from that specific time period. And, significantly, there is no evidence that the detective, the analyst, or other law enforcement officers conducted a "wholesale fishing expedition"[41] by searching any of the remaining content from Reyes's cell phone to develop leads to other evidence in this case or for any other purpose.

In addition, the analyst testified that the text messages at issue were not found on the cell phone's basic instant messaging platform, but were, instead, found on an entirely separate application, the "What's App Chat program," which she described as "a chat program you can chat back and forth online so you don't have to use . . . part of your cell phone provider['s] data texting limit. . . . You can circumvent that [by] using What's App." Thus, given Reyes's admission that he was texting and talking on his phone during the rape, and given the reasonable possibility that he also video recorded or photographed the rape, we agree with the State's argument that the search warrant "had to be written to encompass a search of all [of] the possible places

---

[41] See *Henson*, 314 Ga. App. at 156-157 (The search warrant authorized a search of the defendant's computer for evidence of the drug crimes at issue, and there was no evidence that the officer searching the computer engaged in a "wholesale fishing expedition." However, while the officer was searching for computer files encompassed by the warrant, he stumbled across images of child pornography, at which point he stopped the search and obtained another search warrant.).

24

that [the] text messages that [Reyes] admitted to sending [and any videos or photos taken] during the rape of the victim might have been saved."[42]

Finally, Reyes's argument is entirely dependent on the *possibility* that a partial download of digital data from Reyes's cell phone, strictly limited to the date and time of the rape, was an available option that could have been performed in 2014 (when the search warrant was obtained), instead of the complete download of data actually conducted. Yet, Reyes failed to present any evidence during the motion for new trial hearing that this option existed, for example, by calling as a witness the AASU analyst who performed the download pursuant to the search warrant. Absent such evidence, Reyes's argument that the search warrant should have limited the digital download to only extracting data from November 29 and 30, 2014, is based upon his mere speculation that such a procedure existed and was available to the detective in

---

[42] See generally *Henson*, 314 Ga. App. at 155-156 (In a drug case, the search warrant authorized a search of the defendant's computer for "electronic records" relevant to the crimes at issue. The Court ruled that, "given that a picture certainly preserves or gives evidence of a fact or event – in many instances as efficiently as a thousand words – [the defendant's] claim that the term 'electronic records' [did] not encompass pictures or photographs lack[ed] merit. Thus, the trial court did not err in finding that the officer's search [of the computer's 'My Pictures' folder] did not exceed the scope of the warrant.").

2014, and such speculation is insufficient to support a claim of ineffective assistance.[43]

We conclude, therefore, that Reyes has failed to meet his burden of showing that his trial counsel was deficient for failing to challenge the validity of the search warrant,[44] nor has he met his burden of making a strong showing that, if counsel had raised such a challenge, the trial court would have suppressed the evidence.[45]

_____

[43] See *Dye v. State*, 266 Ga. App. 825, 827 (2) (a) (598 SE2d 95) (2004) (Speculation that raises no more than a mere possibility is legally insufficient to support a claim of ineffective assistance of counsel.); see also *Lawson v. State*, 280 Ga. App. 870, 873-874 (2) (f) (635 SE2d 259) (2006) (The appellant argued that his trial counsel was ineffective for failing to discover if there were other witnesses who might have heard the victim scream while she was being raped and molested. However, during the motion for new trial hearing, the appellant failed to show that any such witness existed. Thus, his claim of ineffective assistance was based on "rank speculation," which was insufficient to establish such claim.); see generally *Adem v. State*, 300 Ga. App. 708, 710-711 (686 SE2d 339) (2009) (The appellant argued that his trial counsel was ineffective for failing to introduce certain evidence. However, because the appellant failed to call any witness or present any documents during the motion for new trial hearing to show that the evidence at issue existed and would have been favorable to his defense, he failed to meet his burden of showing that trial counsel's performance was deficient.).

[44] See *Burke*, 316 Ga. App. at 389 (1) (a); see also *Smith*, 296 Ga. at 735 (2) (a).

[45] See *Mayes*, 229 Ga. App. at 373 (1); see also *Smith*, 296 Ga. at 735 (2) (a); see generally *Stephens v. State*, 346 Ga. App. 686, 689-693 (2) (816 SE2d 748) (2018) (During a custodial interview, the defendant unlocked his cell phone to obtain a phone number, and the interviewing police officer seized the phone while it was unlocked and downloaded the contents of the phone without looking at the

26

(c) In addition, it is important to note that the text messages at issue were not the only evidence supporting a finding that Reyes was guilty of raping the victim as a party to the crime.[46] For example, as shown above, when Reyes and Carcamo first picked up the victim from outside of the club and started walking off with her, a nightclub employee asked the men if they knew her, and they lied to him, telling him that the victim was their "good friend" and that they would take care of her. The serviceman and other witnesses saw Reyes and Carcamo carry the victim between them down the street until Carcamo had to carry her, and surveillance videos from the area corroborated this testimony. While the men carried her to Reyes's car, the victim's head and arms were hanging down, she could not walk unassisted, and she appeared to be unconscious. Evidence showed that the victim's blood alcohol level at the time of the rape was high enough to cause severe cognitive and physical impairment. Carcamo raped the victim in the back seat of Reyes's car, while Reyes

---

information obtained from the download. The officer then obtained a warrant to search the downloaded information; none of the information used to obtain the warrant had been derived from the download. This Court held that, even if the initial warrantless downloading of the contents was unlawful, the actual search of the phone's contents was acquired pursuant to the execution of a valid search warrant. Thus, the trial court did not abuse its discretion in denying the defendant's motion to suppress.).

[46] See Footnote 7, supra, regarding the law as to a party to a crime.

was sitting in the driver's seat, talking and texting on his phone. Finally, while Carcamo's testimony during their joint trial did not directly incriminate Reyes, it did contradict the statements Reyes made to the detective during the first interview, conducted a few hours after the rape.

Viewing this evidence of Reyes actively "aid[ing] or abet[ting]"[47] Carcamo's rape of the victim in the light most favorable to the jury's verdict,[48] we find that Reyes has failed to show that, even if his counsel had challenged the validity of the search warrant, and the trial court had suppressed Reyes's text message as a result, there is a reasonable probability that the outcome of his trial would have been different.[49]

---

[47] See OCGA § 16-6-20 (b) (3).

[48] See *Carcamo*, 348 Ga. App. at 383.

[49] See *Moye v. State*, 277 Ga. App. 262, 265 (3) (626 SE2d 234) (2006) (holding that, in light of the other evidence presented that tied the appellant to the armed robbery of a pharmacy, there was no reasonable likelihood that the outcome of the trial would have been different if the court had suppressed evidence of the appellant's possession of drugs stolen in the robbery); *Ponder v. State*, 201 Ga. App. 388, 390 (2) (411 SE2d 119) (1991) (holding that, in light of other evidence presented that showed the appellant and his car matched the descriptions of the armed robber and the getaway car and that would "have proven each and every essential allegation of the crime alleged[,]" there was no reasonable likelihood that the outcome of the trial would have been different if the court had suppressed the appellant's shirt and gun that had been seized from the appellant's vehicle).

Consequently, the trial court did not err in ruling that Reyes was not entitled to a new trial based on this ineffective assistance claim.

2. Reyes contends that his trial counsel was deficient for failing to object or move for a mistrial based on the "speculative" testimony of the serviceman who had alerted police officers after seeing Reyes walking with Carcamo as Carcamo carried the apparently unconscious victim to Reyes's car. The trial transcript shows that the prosecutor asked the serviceman if he was able to see what was going on inside the car. The serviceman responded that he could not, then spontaneously added: "[W]hat I did see, the [car's] vanity light would turn on and off intermittently. [Reyes was] not sitting inside the vehicle, but he was outside on his cell phone still. *I don't know if [Reyes] was giving directions or being on the lookout*, but he was just outside the vehicle."[50] Almost immediately after this testimony, the prosecutor asked the serviceman, "[W]hat was going through your head? What were you thinking?" Carcamo's counsel objected, stating that the prosecutor was "not asking [the serviceman] what he saw or heard, just what he's thinking[,]" but the trial court overruled the objection. The serviceman then testified that: "I didn't feel that what I observed from everything leading up to the vehicle was right at all. I don't want to

_____

[50] (Emphasis supplied.)

give my biased feeling or opinion, but it made me upset because I don't know why [the victim] would be carried unconscious to the vehicle and the [car's interior] light [would] turn on and off."

Reyes argues that the italicized statement above was "speculative" and, thus, objectionable, but he has failed to cite to any authority to show that the statement was inadmissible or otherwise improper. Moreover, when Reyes's trial counsel was asked, during the motion for new trial hearing, why she did not object to the serviceman's statement, she testified that Carcamo's attorney had already objected and the court had overruled it. According to counsel, she "did not want to ask the question again or reemphasize that particular part of the testimony in front of the jury." She also testified that the serviceman's statement was consistent with Reyes's defense, i.e., that Reyes was in the front seat texting and talking on his phone and was not paying attention to Carcamo and the victim while they were in the back seat, and that Reyes was outside of the car for at least part of that time.

As the trial court ruled in its order denying the motion for new trial,

> pretermitting whether trial counsel was ineffective for not objecting to the [serviceman's] statement as speculative, [Reyes] has not shown that he was prejudiced. The [serviceman] had already testified about seeing [Reyes] walking along as [Carcamo] carried the victim's lifeless body

30

to the parked car. The surveillance video likewise showed [Reyes] with [Carcamo] at Club 51 and later as they traveled with the victim to the parked car. In addition, the evidence at trial showed [Reyes] sent a text message about the victim, and [Reyes] was found in the front seat of the car while [Carcamo] was having sex with the unconscious victim in the back seat.

Given the overwhelming evidence of Reyes's actions and intent in this case, Reyes has failed to show that, if his trial counsel had objected to the statement, the court would have sustained it, nor has he shown that, even if the court had sustained the objection and instructed the jury not to consider the statement, there was a reasonable probability that the outcome of the trial would have been different.[51]

3. Reyes contends that his trial counsel was deficient for failing to object or move for a mistrial when the State introduced an audio recording of the victim's interview with the detective during the detective's testimony. Reyes argues that the evidence of the victim's out-of-court statements constituted inadmissible hearsay testimony.

During the motion for new trial hearing, appellate counsel repeatedly pointed out to trial counsel that, during the audio recorded interview, the victim could be

---

[51] See *Williams*, 277 Ga. at 857 (6).

heard "sobbing pretty much uncontrollably[ ]" and sounding "very pitiful[.]" Trial counsel responded that the victim "sounded incoherent and not too aware of what had happened [on the recording]. [A]s I recall[, the victim] was concerned that she [was in trouble because she] had been drinking before she turned 21." Although Reyes's appellate counsel appeared to suggest that the victim's emotional demeanor constituted a basis to object to playing the recording for the jury, he never asked trial counsel why she did not object to the recording on that basis, nor has Reyes cited to any authority on appeal to support a finding that the audio recording should have been excluded simply because of the victim's demeanor.

More importantly, appellate counsel never argued during the new trial hearing that the recording constituted inadmissible hearsay,[52] nor did he ask trial counsel why she did not raise a hearsay objection to the recording. In fact, the recording may not have constituted hearsay at all, given that the victim testified at trial and was extensively cross-examined by Carcamo's counsel, who used the transcript of the victim's interview to attack the victim's credibility, without objection. And, significantly, the audio recording of the interview was not played for the jury until the

---

[52] It appears that appellate counsel first raised the hearsay argument in his post-hearing brief.

detective testified *the next day* (and several witnesses later). So, to the extent the recording constituted hearsay, it was merely cumulative of other admissible evidence presented at trial. As this Court has consistently held, the failure to object to hearsay that is merely cumulative of other admissible evidence does not constitute ineffective assistance.[53]

Further, the recording was clearly relevant to other issues at trial, including the victim's emotional state and the effects of her intoxication on her ability to speak, answer questions, and recall what had happened during the interview, which was conducted about "two-and-a-half hours" after the officers found her in the back seat of Reyes's car. Under the circumstances presented, we find no reversible error.

4. Reyes claims that his counsel was deficient for failing to call as defense witnesses two of the victim's friends, who had been celebrating with the victim and her twin sister on their 21st birthday before the group became separated and the victim was raped. Reyes argues that the witnesses' testimony would have been

---

[53] See, e.g., *Ingram v. State*, 262 Ga. App. 304, 305 (2), 309 (5) (585 SE2d 211) (2003) (holding that, "[w]here, as here, legally admissible evidence of the same fact is introduced, the erroneous admission of hearsay is harmless[ ]" and concluding that, because "the testimony [was] cumulative and therefore harmless, [the appellant] has not shown a reasonable probability that[,] but for counsel's alleged deficiency [in failing to object to it], the outcome of the proceedings would have been different[ ]").

favorable to his defense because the witnesses were among the last people to see the victim before the rape.

"An appellate court evaluates counsel's performance from counsel's perspective at the time of trial. As a general rule, matters of reasonable tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel."[54] "[T]he decision as to which defense witnesses to call is a matter of trial strategy and tactics, [and] tactical errors in that regard will not constitute ineffective assistance of counsel unless those errors are unreasonable ones no competent attorney would have made under similar circumstances."[55]

Reyes's appellate counsel called the two witnesses to testify during the hearing on the motion for new trial. When Reyes's trial counsel was later questioned about why she did not call the witnesses at trial, however, counsel specifically testified that, after reviewing what the witnesses had said during their interviews with the detective

---

[54] *Grier v. State*, 273 Ga. 363, 365 (4) (541 SE2d 369) (2001) (citation and punctuation omitted).

[55] *Watkins v. State*, 285 Ga. 355, 358 (2) (676 SE2d 196) (2009) (citations and punctuation omitted). See *Adem*, 300 Ga. App. at 712 (2) ("In the realm of specific decisions regarding trial strategy, and in particular decisions about which witnesses should be called to testify, defense attorneys are afforded wide discretion.") (punctuation and footnote omitted).

prior to trial, she had concluded that the witnesses' testimony would not have been helpful to Reyes's defense. According to trial counsel, in her opinion, the witnesses "would have been supportive of their friend, [the victim], and would not have been valuable witnesses to [Reyes]."

> Further, during the motion for new trial hearing, the trial court stated that it had
>
> finally figured out [that] you had the two witnesses testify [during the motion hearing] because you were hoping that you could show that it was ineffective [assistance] not to call them because [the victim] didn't appear as intoxicated as the testimony was, but clearly [the witnesses] wouldn't have helped obviously. It would have probably been worse for the Defendants [if the witnesses had testified at trial].

And, in its order denying Reyes a new trial, the trial court ruled that Reyes's trial counsel did not provide deficient performance by not calling the witnesses at trial. According to the court, "[t]he proffer [during the motion for new trial hearing] of what would have been [the witnesses'] testimony does not contradict trial counsel's contention that the witnesses would have no benefit to [Reyes]." The court pointed out that one of the witnesses was not in the nightclub with the victim before Carcamo and Reyes carried her away, and the other witness (who had been kicked out of the

club with the victim and then wandered off, leaving the victim alone) had "nearly no recollection of that night due to her own intoxication."

Because the record shows that counsel made a reasonable strategic decision not to call the witnesses at trial, and it supports the trial court's conclusion that Reyes had not demonstrated prejudice resulting from that decision, Reyes cannot prevail on this ineffectiveness claim.[56]

5. Reyes contends that his trial counsel was ineffective for failing to object to the trial court's jury instruction regarding the effect of the victim's intoxication and/or lack of consciousness on her ability to consent. The transcript shows that the trial court instructed the jury on the elements of rape; the State's burden of proving each of those elements, including the victim's lack of consent, beyond a reasonable doubt; and the law that a victim's consent, when induced by force, intimidation, or fear of harm, does not constitute valid consent that would serve as a defense to a rape charge. The court then gave the jury the following instruction:

> If you believe beyond a reasonable doubt that the defendant did have sexual intercourse with the alleged victim, then as I have explained, you must decide the issue of consent. If you find the alleged

---

[56] See *Grier*, 273 Ga. at 365 (4); *Watkins*, 285 Ga. at 358 (2); *Adem*, 300 Ga. App. at 712 (2).

36

victim was not mentally capable of exercising judgment or of expressing intelligent consent or objection to the act of intercourse then you would be authorized to find the defendant guilty of rape. *In that regard, you may consider whether the alleged victim's ability to consent is temporarily lost from intoxication or unconsciousness.*[57]

On appeal, Reyes argues that the italicized portion of the charge was not part of the pattern jury charge and that the instruction was inconsistent with a government study regarding the effects of intoxication.[58] Reyes contends that the study supported Reyes's defense theory that the victim had, indeed, consented to having sex with Carcamo, but she must have forgotten that she had done so due to her intoxication. According to Reyes, "[n]ot remembering is not the equivalent of not consenting[,]" so simply because the victim did not remember everything that had happened that night "due to an alcohol blackout, [that did] not mean that the sexual activity was not consensual[.]"

---

[57] (Emphasis supplied.)

[58] Reyes first raised the issue regarding the government study in his post-hearing brief on his motion for new trial. He did not submit evidence of the study in the trial court or in this Court, instead just citing to a single 2004 publication that was purportedly on the website of the National Institute of Health.

This Court, however, has held that the following instruction was a correct statement of the law: "Sexual intercourse with a woman whose will is temporarily lost from intoxication or unconsciousness arising from the use of drugs or other cause or sleep is rape."[59] In fact, during the new trial hearing, when Reyes's trial counsel was asked why she did not object to the italicized portion of the instruction, trial counsel testified that she believed it was a correct statement of the law. Thus, counsel's failure to object was the result of a reasonable, intentional decision, not a negligent oversight, and did not constitute deficient performance.[60]

More importantly, this was a joint trial, with Carcamo as Reyes's co-defendant. Carcamo's "whole defense[ ]" was based on his assertion that he had a "consensual sexual encounter[ ]" with the victim, who was intoxicated but was still able to talk and flirt with him (Carcamo), and that it was the victim who initiated the sexual contact by kissing him. Thus, the jury instruction at issue was relevant, applicable,

---

[59] *Cook v. State*, 338 Ga. App. 489, 493 (2) (790 SE2d 283) (2016) (punctuation omitted).

[60] See *Grier*, 273 Ga. at 365 (4).

and adjusted to the issues to be decided by the jury.[61] Consequently, Reyes's argument lacks merit.[62]

6. Reyes contends that his trial counsel was ineffective for failing to object to the trial court's response to the following question from the jury during deliberations: "[C]ould you please explain parties to a crime a little better, part C. Part C is intentionally advises, encourages, hires, counsels or procures another to commit the crime. Does the person that is encouraged to commit the crime have to actually commit the crime for the encourager to be a party to the crime?" In response, the trial court repeated the original jury instruction, which was simply a recitation of OCGA § 16-2-20. The court then asked the jurors if they needed a definition of "aid and abet," and the foreman responded that they did not. The court also spontaneously repeated its instruction on the defendants' intent and suggested that the jurors look at the written copy of the jury instructions that they had available during deliberations, telling them to consider all of the instructions as a whole. The court

---

[61] See *Marryott v. State*, 263 Ga. App. 65, 69 (5) (587 SE2d 217) (2003) ("A jury charge must be adjusted to the evidence, apt, and a correct statement of the applicable law.") (citation and punctuation omitted).

[62] See *Burke*, 316 Ga. App. at 389 (1) (a) (failure to make a meritless objection does not constitute ineffective assistance).

stated that "those two charges [as to the issues of party to a crime and intent] may assist you in resolving the question that you have. And that is really all that I can do to provide any more guidance."

Although Reyes concedes, on appeal, that the trial court's recharge to the jury was a correct statement of the law, he argues that the court's additional statements to the jury, particularly on the issue of intent, exceeded the bounds of the jury's question (i.e., "Does the person that is encouraged to commit the crime have to actually commit the crime for the encourager to be a party to the crime?"). According to Reyes, instead of recharging the jury, the court should have simply answered, "Yes." Thus, he argues that his trial counsel was deficient for failing to object to the court's response to the jury's question.

When asked why she did not object at trial, Reyes's trial counsel testified that she thought the recharge was a correct statement of the law, that the court was only repeating what it had previously instructed the jurors, and that the court's response was appropriate given that the jurors had a written copy of all of the jury instructions available during deliberations. Further, as the trial court concluded, because it "responded by correctly restating the law to the jury, there was no good faith basis for [Reyes's] trial counsel to object." The record supports the court's finding that Reyes

40

failed to demonstrate that counsel's failure to object constituted deficient performance or that he was prejudiced thereby.[63] Consequently, this argument presents no reversible error.

*Judgment affirmed. Miller, P. J., and Rickman, J., concur*.

---

[63] See *Williams*, 277 Ga. at 857 (6); *Burke*, 316 Ga. App. at 389 (1) (a).